United States District Court
Southern District of Texas
**ENTERED**
December 02, 2022
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| TRAVIS BRUNET, | § | |
| Individually and on behalf of all others | § | |
| similarly situated, | § | |
| | § | |
| *Plaintiff,* | § | |
| v. | § | |
| | § | No. 4:21-CV-1600 |
| GB PREMIUM OCTG SERVICES | § | |
| LLC, | § | |
| | § | |
| *Defendant.* | § | |

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Pending before the Court is Plaintiff Travis Brunet's, individually and on behalf of all others similarly situated, Opposed Motion for Certification and Notice to Putative Class Members ("motion"). ECF No. 78.[1]  In this action, Plaintiff claims that Defendant GB Premium OCTG Services, LLC ("GB Premium") misclassified current and former thread representatives as independent contractors. According to Plaintiff, because the thread representatives were GB Premium employees, GB Premium's failure to pay them overtime was a violation of the Fair Labor Standards Act of 1938, § 7, 29 U.S.C. § 207(a) ("FLSA").[2]

---

[1] The district judge to whom this case is assigned referred this matter for all pretrial purposes pursuant to 28 U.S.C. § 636. Order, ECF No. 30. A motion for class certification is dispositive and therefore is appropriate for a report and recommendation. 28 U.S.C. § 636 (b)(1)(A).

[2] The FLSA provides that no employer shall employee any employee for a workweek longer than forty hours "unless such employee receives compensation for his employment in excess of the

The issue before the Court is whether the proposed class of thread representatives is sufficiently similarly situated such that Brunet's claims can be properly addressed collectively.[3] Based on the briefing, applicable law, and extensive evidence presented, the Court finds that application of the economic-realities test to determine whether the thread representatives are employees or independent contractors will require a highly individualized inquiry not suited for collective determination. This is because the evidence presented varied among the thread representatives to such a degree that a collective action would devolve into a series of individual inquiries into each member of the proposed class.

Accordingly, Brunet's motion should be denied.

## I.    BACKGROUND

GB Premium provides oilfield services, including inspecting and maintaining tubular connections. Def.'s Opp. to Mot. for Certification, ECF No. 86 at 9. Thread representatives monitor the running of oil country tubular goods, including tubular connections. *Id*. As part of its business, GB Premium employed thread representatives as employees and, because of the cyclical nature of its business,

---

hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."

[3] Defendant filed a response in opposition to the motion to certify the class. Def.'s Resp., ECF No. 86. Plaintiff filed a reply in support of the motion. Pl.'s Reply, ECF No. 91. Defendant filed a sur-reply. Def.'s Sur-Reply, ECF No. 94. Defendant failed to file a motion requesting leave to file a sur-reply in violation of the local rules. L.R. 7.4. Nonetheless, the Court considered the sur-reply.

contracted with thread representatives as independent contractors. Tilley Decl. ¶ 3, ECF No. 86-3. Brunet worked as a thread representative for GB Premium from April 2014 through March 2021. Def.'s Answer ¶ 26, ECF No. 11. Brunet worked for GB Premium pursuant to an independent contractor agreement. Brunet Decl. ¶ 2, ECF No. 78-1. According to Brunet's complaint, although he was hired as an independent contractor, he and all similarly situated thread representatives were in fact GB Premium employees. Brunet alleges that because thread representatives were GB Premium employees, its' failure to pay them overtime for all hours worked over forty hours a week violated the FLSA. ECF No. 1 at ¶ 2.

The instant motion seeks certification and notice pursuant to 29 U.S.C. § 216(b) of a collective action. Plaintiff defines the purported class as consisting of:

> current and former Thread Representatives who were paid by the hour, did not receive any commissions, and were not paid overtime and who worked for GB Premium OCTG Services, LLC ("GB") throughout the United States, at any time since April 1, 2018, through the final disposition of this matter.

ECF No. 78 at 1. Defendant objects to certification and notice to the putative class Plaintiff proposed.

## I.   THE STANDARD FOR CERTIFYING A COLLECTIVE ACTION.

The FLSA gives *employees* the right to bring an action against an employer that failed to pay its employees overtime for work in excess of forty hours in a week. 29 U.S.C. § 216(b). Employees may proceed in a collective action when they are

"similarly situated." *Id.* District courts have the discretionary power to certify collective actions and order notice to putative class members. *Swales v. KLLM Transp. Servs.*, L.L.C., 985 F.3d 430, 436 (5th Cir. 2021).

The Fifth Circuit recently decided *Swales*, clarifying the standard district courts should use in determining whether to allow a representative plaintiff to proceed with an FLSA collective action. Prior to *Swales*, most district courts in the Fifth Circuit followed the two-step certification approach outlined in *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J. 1987). *Swales*, 985 F.3d at 436. Step one, often described as conditional certification, "require[s] little more than 'substantial allegations that the putative collective members were together the victims of a single decision, policy, or plan.'" *Id.* (quoting *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102 (10th Cir. 2001)). The second step occurs after discovery, when a district court "makes a second and final 'determination, utilizing a stricter standard,' about whether the named plaintiffs and opt-ins are 'similarly situated' and may therefore proceed to trial as a collective." *Id.* at 437 (quoting *Thiessen*, 267 F.3d at 1102-3).

In *Swales*, the Fifth Circuit rejected this approach, finding that, nothing in the FLSA, nor in Supreme Court precedent, authorizes conditional certification. *Id.* at 440. Instead, the Fifth Circuit held that "the district court's job is ensuring that notice goes out to those who are 'similarly situated,' in a way that scrupulously

4

avoids endorsing the merits of the case." *Id.* Notice can only go to potential participants and sending notice to those who ultimately cannot participate stirs up litigation, which is what the Supreme Court warned against. *Id.* at 441. A court must decide whether merits questions can be answered collectively from the outset. *Id.* at 442. Thus, *Swales* instructs district courts to "rigorously scrutinize the realm of 'similarly situated' workers" before certifying a collective action to ensure that "the requested opt-in notice will go to those who are actually similar to the named plaintiffs." *Id.* at 434.

## II.   PLAINTIFFS HAVE NOT MET THEIR BURDEN TO SHOW THAT THREAD REPRESENTATIVES ARE SIMILARLY SITUATED.

The dispute here is whether Plaintiff and the other thread representatives are employees, because only employees are entitled to FLSA protections. *See* 29 U.S.C. § 152(3) (defining "employee" to exclude any independent contractor). In *Swales*, the Fifth Circuit instructed that, in a misclassification case, even though the question is intertwined with the merits, the district court must determine at the outset if it can determine on a collective basis whether a valid independent-contractor classification exists that would bar application of the FLSA. *Swales*, 985 F.3d at 441. In making that assessment, the district court must consider all the available evidence to determine whether the economic realities test can be applied on a collective basis. *Id.*

Although *Swales* invalidated *Lusardi*'s lenient two-step approach, district

5

courts continue to apply the factors identified in *Lusardi* to determine whether plaintiffs have met their burden to show that potential collective action members are "similarly situated." *See Fuller v. Jumpstar Enterprises*, LLC, No. CV H-20-1027, 2021 WL 5771935, at *3 (S.D. Tex. Dec. 6, 2021) (collecting cases). "While [the similarly situated] inquiry does not mean that the class members must be identically situated, it does mean that the Plaintiff must show a 'demonstrated similarity' among the purported class members, as well as a 'factual nexus' that binds the class members' claims together such that hearing the claims in one proceeding is fair to all parties and does not result in an [unmanageable] trial of individualized inquiries." *Klick v. Cenikor Founda.*, No. 4:19-cv-01583, 2022 WL 1028065, at *4 (S.D. Tex. Apr. 6, 2022) (Ellison, J.) (citations omitted). Courts consider three factors in deciding whether purported class members are sufficiently similarly situated: (1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant which appear to be individual to each plaintiff; and (3) fairness and procedural considerations. Plaintiffs argue that each of these factors weigh in favor of certification. ECF No. 78 at 7-8. Defendants respond that Brunet has not met his burden. The Court considers each factor in turn.

### A. Plaintiffs Do Not Have Disparate Factual and Employment Settings.

The first factor to consider is whether disparate factual and employment settings exist among putative class members. *Falcon v. Starbucks Corp.*, 580

6

F.Supp.2d 528, 534 (S.D. Tex. 2008). In making this determination, courts consider various aspects of the putative class member's work, including job title, job duties, geographic location, supervision, salary, policies and procedures subjected to, the manner in which policies and procedures were instituted, and whether actions constituting claimed violations are similar. *See Fuller*, 2021 WL 5771935, at *4-7; *Reyes v. Tex. Ezpawn*, L.P., CIV.A. V-03-128, 2007 WL 101808, at *2 (S.D. Tex. Jan. 8, 2007) (citing *Johnson v. TGF Precision Haircutters, Inc.*, CIV.A. H-03-3641, 2005 WL 1994286, at *2 (S.D. Tex. Aug. 17, 2005)). "The question is whether [the putative class members] are all subjected to a common policy, plan, or practice—the same factual and employment settings." *Serrano v. Republic Servs., Inc.*, No. 2:14-CV-77, 2017 WL 2531918, at *19 (S.D. Tex. June 12, 2017) (citing *Vanzzini v. Action Meat Distribs.*, 995 F. Supp. 2d 703, 722-23 (S.D. Tex. 2014)).

Plaintiffs argue that this factor favors certification because "the class members performed similar work, were subjected to similar employment conditions, and were treated the same by their alleged employers." ECF No. 78 at 12. Although there are numerous differences among the thread representatives, the Court finds that the these do not amount to disparate factual and employment settings.

Significantly, although thread representatives held various job titles, Shriver Dep. 28:3-15, ECF No. 78-4 (stating that thread representatives had various titles, including thread representatives, field service representatives, and field service

technicians); Brunet Dep. 261:4-8, ECF No. 78-5 (testifying that title of position was thread inspector), their duties were largely the same. That is, thread representatives are responsible for monitoring the running of oil country tubular goods,[4] including tubular connections, and operators rely on them to visually inspect connections to ensure they are in good working order. Foret Dep. 204:10-19, ECF No. 86-1. GB Premium offered thread representatives work at client job sites. Brunet Dep. 276:17-25, ECF No. 78-5 (Brunet testified that GB Premium would offer thread representatives the opportunity to do work for GB Premium's clients); Tilley Decl. ¶ 4, ECF No. 86-3 ("once a job comes in, GB Premium will notify an IC Thread Representatives who is qualified and/or certified to perform the job. If that IC Thread Representative turns down the job, which happens all the time, we will call the next qualified/certified IC Thread Representative."). Further, all thread representatives were paid hourly and did not receive overtime, Tilley Decl. ¶ 17, ECF No. 86-3 ("Thread Representatives are generally paid for each hour they are on a job"), although on some jobs thread representatives were paid a flat day rate, Brunet Dep. 180:16-24, ECF No. 78-5 at 61.

However, GB Premium's thread representative jobs were not all the same. For example, the length of jobs varied significantly, with some requiring thread

---

[4] Oil Country Tubular Goods (OCTG) refers to the casing, tubing, piping and pipelines used in the petroleum industry. *Glossary: Oil Country Tubular Goods (OCTG)*, Petrowiki, https://petrowiki.spe.org/Glossary:Oil_Country_Tubular_Goods_(OCTG) (last visited Nov. 7, 2022).

representatives to work on a site for days while others required weeks. Hanks Decl. ¶ 15, ECF No. 86-6 ("The length of a specific job will vary. Some jobs take two days; others take weeks."). Further, a typical job required twenty-four hour shifts for the duration, while a daylight job would be limited to sixteen-hour shifts, Brunet Dep. 115:4-16, ECF No. 78-5. Additionally, duo-line jobs involved more manual labor and paid more than typical jobs. Tilley Decl. ¶ 19, ECF No. 86-3.

Additionally, there was also no set location where thread representatives worked. Thread representatives would work at various job sites, which included sites in New Mexico, California, Colorado, Alaska, North Dakota, Mississippi, Louisiana, and the Gulf of Mexico. Brunet Dep. 263:15-19, ECF No. 78-5.

Although there is not uniformity among members of the putative class, the similarities here are sufficient to find that the first factor favors a finding that thread representatives are similarly situated. The differences among the thread representatives are similar to those amongst a proposed class of drivers in *Serrano*, 2017 WL 2531918, at *19. In that case, drivers could be assigned to different routes, equipment, and customers on a daily basis, and the number of hauls assigned was not guaranteed or static. *Id*. Despite these differences, the court concluded that, because all drivers were subject to the same policy regarding non-production time, "[t]hose variations [went] to the magnitude of the effect of the common decision on individual drivers rather than undermining the fact that it was a common policy,

plan, or practice that affected them all." *Id*. So too here. The thread representatives all performed essentially the same work and were subject to the same policy of no overtime for hours worked over forty hours a week.

### B. The Defenses Available to GB Premium Require Scrutiny of Each Individual Purported Plaintiff.

Brunet argues that the second factor—defenses available to the defendant which appear to be individual to each plaintiff—weighs in favor of class certification. First, Brunet argues that this factor favors certification because GB Premium asserts the "same defense against each Plaintiff and Putative Class Member—that they are independent contractors." ECF No. 78 at 19. Second, Brunet argues that the economic realities test may be applied collectively to the thread representatives. *Id*. at 20. In response, GB Premium argues that its defense that the thread representatives are independent contractors is too individualized to support class wide determination.[5]  The Court finds that this factor weighs against a similarly situated finding because application of the economic realities test here would require a highly individualized inquiry that would "prevent an efficient proceeding with a

---

[5] GB Premium appears to believe this argument pertains to the disparate employment setting factor. ECF No. 86 at 28 ("Thus, for all the reasons that the disparate factual settings factor weighs against certification"). However, whether thread representatives are independent contractors or employees is a defense, and, therefore, the Court addresses it here. *See Cruz v. Conocophillips*, 208 F. Supp. 3d 811, 817 (S.D. Tex. 2016) (explaining that the contention that purported employees are independent contractors is a defense requiring application of the economic-realities test).

representative class." *See Reyes*, 2007 WL 101808, at *5. [6]

### 1. Assertion of a global defense alone does not support class certification.

Brunet urges the Court to find that this factor supports a similarly situated finding because GB Premium asserts the same defense against all members of the putative class—that the thread representatives are independent contractors. ECF No. 78 at 19. For this proposition, Brunet principally relies on *Britt v. Mississippi Farm Bureau Cas. Ins. Co.*, No. 1:18-CV-38-GHD-DAS, 2022 WL 331210, at *4 (N.D. Miss. Feb. 3, 2022) and *Segovia v. Fuelco Energy LLC*, 2021 WL 2187956, at *6 (W.D. Tex. May 28, 2021). Neither case supports such a limited inquiry here. In *Britt*, the court rejected an argument that class certification was inappropriate

---

[6] GB Premium also asserts that individualized scrutiny is required for three additional defenses. First, it argues that individualized scrutiny would be necessary to the extent that the putative class includes W-2 employees. ECF No. 86 at 29. The putative class does not include W-2 employees because they were not paid on an hourly basis. Moreover, GB Premium provides no explanation as to what the individualized inquiry would entail. Second, GB Premium asserts that individualized scrutiny would be necessary to showing that certain claimed overtime was attributable to non-compensable time. *Id*. However, "[v]ariations in the quantity of time lost as uncompensated goes to damages, not liability." *Serrano*, 2017 WL 2531918, at *19. Third, relying on *White v. 14051 Manchester Inc.*, 301 F.R.D. 368, 377 (E.D. Mo. 2014), GB Premium contends that because Brunet did not file taxes, serious credibility issues "entitle [it] to cross-examine each" thread representative "regarding their status as independent contractors and damages." ECF No. 86 at 29-30. GB Premium's assertion finds no support in *White*. The issue in *White* was that the class representatives' deposition testimony was inconsistent with the declarations they submitted in support of conditional certification regarding whether the tip policy at issue in that case was applied to locations where the class representatives did not work. *White*, 301 F.R.D. 368, 376-77. No similar issue is identified here. Moreover, the purported credibility issue GB Premium complains of—Brunet's failure to pay taxes—is not like the one in *White* given that it is not relevant to the case. The Court views this as less an argument against class certification than an opportunity for GB Premium to continue raising the issue of Brunet's taxes. *See* ECF No. 86 at 8, 11, 24, 25.

because defendants intended on asserting certain defenses against some plaintiffs and not others. 2022 WL 331210, at *4. In *Segovia*, the court found that defendant's defense that "time claimed as overtime is simply not compensable" did not weigh against class certification. 2022 WL 331210, at *10. Additionally, the application of the economic-realities test was not at issue in *Segovia*. *Id*. at *6. In contrast, here, the question is whether "a highly individualized inquiry into each potential opt-in's circumstances" will be necessary to answer whether they are independent contractors or employees. *Swales*, 985 F.3d 442. Furthermore, Brunet's contention is inconsistent with *Swales*. In *Swales*, the Fifth Circuit reversed the district court for failing to "consider the evidence relating to this threshold question in order to determine whether the economic-realities test could be applied on a collective basis." *Id*.

> ## 2. The economic-realities test requires a highly individualized inquiry into each of the thread representatives' particular circumstances.

To determine whether the independent contractor is an employee, the threshold question "depends on the economic realities test, which asks how much control the employer had over the independent contractor." *Id.* at 442 (citing *Herman v. Express Sixty-Minutes Delivery Serv., Inc.*, 161 F.3d 299, 303 (5th Cir. 1998)). "To determine if a worker qualifies as an employee, [courts] focus on whether, as a matter of economic reality, the worker is economically dependent upon the alleged

employer or is instead in business for himself." *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 343 (5th Cir. 2008); *Herman*, 161 F.3d at 303. To conduct this analysis, courts apply the economic realities test, which focuses on five non-exhaustive factors:

> (1) the degree of control exercised by the alleged employer;
>
> (2) the extent of the relative investments of the worker and the alleged employer;
>
> (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer;
>
> (4) the skill and initiative required in performing the job; and
>
> (5) the permanency of the relationship.

*Herman*, 161 F.3d at 303; *Cruz v. Conocophillips*, 208 F. Supp. 3d 811, 818 n.2 (S.D. Tex. 2016). Here, the Court analyzes whether the proof offered for each of these factors indicates that the "economic-realities test [can] be applied on a collective basis" or "requires a highly individualized inquiry into each potential opt-in's circumstances." *Swales*, 985 F.3d 442. The Court concludes that such an individualized inquiry is necessary in this case.

### a. The degree of control factor requires an individualized inquiry.

The degree of control factor looks to whether "an individual exerts such control over a meaningful part of the business that [the individual] stands as a separate economic entity. *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d

369, 381 (5th Cir. 2019) (quoting *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1312–13 (5th Cir. 1976)). The relevant inquiry is whether "the worker has a viable economic status that can be traded to other companies, keeping in mind that lack of supervision of the individual over minor regular tasks cannot be bootstrapped into an appearance of real independence." *Hobbs v. Petroplex Pipe & Constr., Inc.*, 946 F.3d 824, 830 (5th Cir. 2020) (quoting *Parrish*, 917 F.3d at 381).

Brunet argues that the degree of control factor weighs in favor of class certification. First, thread representatives were required to fill out the same GB Premium template documents for each job. ECF No. 78 at 22 (citing evidence, including Brunet Decl. ¶ 41, ECF No. 78-1.). Second, GB Premium controlled which jobs were offered to thread representatives. *Id.* (citing evidence, including Brunet Decl. ¶ 33, ECF No. 78-1.). Third, GB Premium controlled the way thread representatives would complete their work on jobs by setting the time thread representatives had to be present at a jobsite. *Id.* In response, GB Premium contends that the forms thread representatives filled out did not provide instructions on how to complete their jobs. ECF No. 86 at 22 (citing Shriver Decl. ¶¶ 9-12, ECF No. 86-4.). While GB Premium concedes that it controlled which jobs were offered to thread representatives, it contends that thread representatives were free to turn down jobs. *Id.* at 22 (citing Tilley Decl. ¶¶ 4-5, ECF No. 86-3; Meche Decl. ¶ 8, ECF No. 86-

5.). Further, thread representatives were free to set their own schedules. ECF No. 86 at 22 (citing Tilley Decl. ¶¶ 24-25, ECF No. 86-3.).

Regarding the GB Premium template forms provided to thread representatives, they do not appear to reflect the degree of control necessary to find an employer employee relationship. Thread representatives received a "job safety & environmental analysis ("JSEA"), the manufacturer's specifications, and a job order providing basic details about the job." Boemio Decl. ¶ 8, ECF No. 86-7. Brunet does not declare that these forms dictated how thread representatives were to perform the job. At most, his declaration states that the safety sheet advised of the hazards to avoid at each step of pipe inspection and the manufacturer's specifications or data sheet was a tantamount to a "cheat sheet," providing information needed to monitor the operator's use of the equipment to ensure it was consistent with the manufacturer's specifications. Brunet Decl. ¶ 17, ECF No. 78-1. In contrast, another thread representative, David Boemio, declared that none of these documents told him how to do his job as a thread representative. Boemio Decl. ¶¶ 8-10, ECF No. 86-7; c*f. Parish*, 917 F.3d at 381-82 ("Premier did not dictate how plaintiffs completed the directional-drilling calculations."). As such, this evidence fails to establish GB Premium's control over how the thread representatives performed their work.

Further, the degree of control factor weighs against certification because other

evidence regarding GB Premium's control differed among the thread representatives. The Fifth Circuit has found that whether workers can turn down work to be a critical question in assessing the degree of control factor. *Hobbs*, 946 F.3d at 830 (finding degree of control factor favored certification where defendant "regularly assigned the pipe welders' specific tasks and the hours to be worked" and there was no evidence that workers turned down assignments); *Parrish*, 917 F.3d at 382 (finding that workers' ability to turn down assignments indicated that the degree of control necessary to finding an employer employee relationship was lacking).

Here, there is conflicting evidence regarding whether thread representatives could turn down GB Premium jobs. For example, Jason Foret testified that if a thread representative turned down work, GB Premium would not offer them jobs in the future. Foret Dep. 186:5-187:23, ECF No. 78-6. In contrast, another thread representative, Glen Meche, submitted a declaration, stating that he "was able to turn down work without adverse consequence." Meche Decl. ¶ 8, ECF No. 86-5. Mark Tilley, GB Premium's President, declared that thread representatives were free to turn down jobs with no adverse consequences and identified several who had turned down jobs and were called again for work afterwards. Tilley Decl. ¶¶ 4-5, ECF No. 86-3. Such conflicting evidence indicates that an individualized inquiry is necessary to determine if a particular thread representative could turn down GB Premium's jobs.

Thus, this factor weighs against certification because the evidence regarding forms GB Premium provided to the thread representatives does not demonstrate control and the evidence of thread representatives' ability to turn down work shows that an individualized inquiry is necessary to determine control.

### b. The extent of the relative investments factor does not require an individualized inquiry.

In comparing the relative investments of the purported employer and worker, the Fifth Circuit "uses a side-by-side comparison method in evaluating this factor." *Parrish*, 917 F.3d at 383 (citing *Hopkins*, 545 F.3d at 344.). This approach compares "the amount the alleged employer and [worker] each contribute to the specific job the [worker] undertakes." *Thibault v. Bellsouth Telecommunications*, Inc., 612 F.3d 843, 848 (5th Cir. 2010).

Brunet argues that this factor weighs in favor of class certification because thread representatives' investments were minimal when compared with those of GB Premium. According to Brunet, thread representatives' investments were limited to the occasional purchase of tools and clothes. ECF No. 78 at 25 (citing evidence, including Brunet Decl. ¶¶ 11, 19, ECF No. 78-1.). In contrast, Brunet indicates that GB Premium's investment, in the form of vehicle expenses, lodging, and food, was more significant. ECF No. 78 at 26 (citing evidence, including Brunet Decl. ¶ 29, ECF No. 78.). GB Premium argues that an individual inquiry is required because the investments made varied from thread representative to thread representative. ECF

17

No. 86 at 25; Meche Decl. ¶ 7, ECF No. 86-5 (Meche declared that he used his truck, computer, printer, cell phone, office space, and tools to perform his work). Further, GB Premium presented evidence that the cost for many of the expenses such as for lodging or tools were passed on to the customer. Tilley Decl. ¶¶ 22, 23, 26, ECF No. 86-3.

Based on the evidence provided, this factor weighs in favor of class certification, albeit weakly. Of the expenses associated with specific projects, there appears to have been a program applicable to all thread representatives whereby GB Premium would pay for typical investments—gas, food, and lodging, even if passed on to the customer. Brunet Decl. ¶¶ 11, 19, ECF No. 78-1. Although certain thread representatives may have invested in items that were helpful to their overall work for GB Premium, the evidence does not show that the purchases "contribute[d] to the specific job" the thread representative undertook. *Thibault*, 612 F.3d at 847 (citing *Carrell v. Sunland Const., Inc.,* 998 F.2d 330, 333 (5th Cir. 1993)). For example, Meche's purchase of a truck was not done, nor does GB Premium ague it was, as an investment in any one job he was performing for GB Premium.

Therefore, this factor does not necessitate the sort of individualized inquiry that would counsel against certifying the class.

### c. The degree to which the employer determined the worker's opportunity for profit or loss requires individualized inquiry.

The opportunity for profit or loss factor focuses on the alleged employer's ability to limit the worker's opportunity to profit from their labor on work performed for the alleged employer. *See Cromwell v. Driftwood Elec. Contractors, Inc.*, 348 F. App'x 57, 61 (5th Cir. 2009). In evaluating this factor, courts in the Fifth Circuit take into account the ability of workers to control their own costs, *Thibault*, 612 F.3d at 848 (looking at workers' ability to control costs associated with "repairs, supply costs, food, water, housing, etc."), and their ability to impact the amount of money paid independent of hours worked, *Hickey v. Akra Industries, Inc.*, 699 F.2d 748, 752 (5th Cir. 1983) (finding that worker's ability to choose what products he sold weighed in favor of independent contractor status).

Brunet contends that this factor "weighs heavily in favor of certification" for two reasons. ECF No. 78 at 27. First, that thread representatives uniformly did not face any losses while working for GB Premium. *Id*. (citing evidence, including Brunet Decl. ¶ 30, ECF No. 78-1.). Second, that thread representatives only opportunity for profit was derived from the hours they worked for GB premium. *Id*. (citing evidence, including Brunet Decl. ¶ 27, ECF No. 78-1.). GB Premium responds that this factor weighs against certification because the opportunities for profit varied based on the individual thread representative. ECF No. 86 at 24.

The evidence put forward supports Plaintiff's position that the thread representatives uniformly did not have any opportunity for loss. Brunet Decl. ¶¶ 28-32, ECF No. 78-1. GB Premium paid thread representatives a mileage rate for the cost of travelling to well sites, reimbursed them for any expenses associated with the project, and provided them with tools to perform their work. *Id*.

Although the evidence regarding the opportunity for loss was uniform among thread representatives, there are significant differences among them regarding their opportunity for profit. For example, some thread representatives chose to work only in specific geographic areas. Tilley Decl. ¶ 6, ECF No. 86-3. That certain thread representatives chose to work in limited geographic areas impacts the district court's determination regarding control over profitability. *Swales*, 985 F.3d at 442 ("Plaintiffs and Opt-ins provided inconsistent discovery responses about the control they had over their profitability—some drivers decided to work only for specific customers or in certain regions"). This is because thread representatives that were willing to take jobs further away could increase their profits. Tilley Decl. ¶ 20, ECF No. 86-3 (thread representatives may increase profits by taking jobs that require extensive driving).

Another significant difference among the thread representatives is that some chose to work duo-line jobs, while others did not. *Id*. ¶ 19. The thread representatives who chose to work duo-line jobs increased their profits because such jobs paid more

than others. *See Sales v. Bailey*, No. 2:12-CV-00056-SA-SAA, 2014 WL 3897726, at *9 (N.D. Miss. Aug. 8, 2014) (citing *Hickey*, 699 F.2d at 752) (where worker can choose between different types of labor that are compensated differently, this indicates that the opportunity for profit or loss factor weighs in favor of independent contractor status).

Furthermore, some thread representatives chose to contract with GB Premium through their own corporate entities while others chose to do so as individuals. Tilley Decl. ¶ 19, ECF No. 86-3; *compare* Meche Decl. ¶¶ 6-7, ECF No. 86-5 (declaring that GB Premium pays Meche's company, not him, and this allows him to maximize his profits), *with* Hanks Decl. ¶ 6, ECF No. 86-6 ("I first contracted with GB Premium in 2010 as an independent contractor Thread Representative. I am still contracting with GB Premium in this capacity for various jobs."). These differences impact the opportunity for profit analysis.

Finally, there are differences among the thread representatives' opportunity for profit from working for other contracting entities. Brunet asserts that he "could not have outside employment with other companies" because he needed "to remain available to GB [Premium]." Brunet Decl. ¶ 38, ECF No. 78-1. In contrast, certain thread representatives worked for other companies when not working for GB Premium, including providing thread representative services to GB Premium's competitors. Meche Decl. ¶ 8, ECF No. 86-5. The differences among thread

representatives in their ability to work for other companies when not working on a GB Premium project impacts the opportunity for profit analysis. *See FedEx Home Delivery v. NLRB*, 563 F.3d 492, 499 (D.C. Cir. 2009) (observing delivery drivers' ability to incorporate and provide delivery services for multiple companies shows entrepreneurial opportunity for gain or loss indicative of independent contractor status); *Gate Guard Servs. L.P. v. Solis*, No. CIV.A. V-10-91, 2013 WL 593418, at *8 (S.D. Tex. Feb. 13, 2013) (finding that workers ability to do extra work for others besides purported employer because workers did not have a set schedule weighed in favor of independent contractor status).

Thus, this factor weighs against certification because it requires individualized inquiries into each thread representative's opportunity for profit.

### d. The skill and initiative required in performing the job factor requires individualized scrutiny.

The skills and initiative factor considers "whether the worker exhibits the type of skill and initiative typically indicative of independent-contractor status." *Hopkins*, 545 F.3d at 345. In evaluating this factor, courts in the Fifth Circuit generally look for some unique skill set, *see Carrell*, 998 F.2d at 333 (noting that "[p]ipe welding, unlike other types of welding, requires specialized skills"), or some ability to exercise significant initiative within the business, *see Hickey*, 699 F.2d at 752 (noting that the plaintiff-salesman controlled "major components" of the business

open to initiative, including advertising, marketing, and the choice of other products to sell).

Brunet argues that this factor favors class certification because thread representatives did not have specialized experience indicative of independent contractor status. In support of this argument, Brunet declared that GB Premium did not require thread representatives to have any experience to be hired. ECF No. 78 at 28; Brunet Decl. ¶ 18, ECF No. 78-1 (Brunet declares he had no prior experience and GB Premium trained him once he was hired). This is because the work performed is not complicated and could be learned on the job. Foret Dep. 274:12-23, ECF No. 78-6 (Foret testified that most of his experience comes from on-the-job training). Furthermore, the simple nature of the work was reflected in that GB Premium provided thread representatives with cheat sheets demonstrating how to complete tasks and offered rudimentary training to thread representatives. Brunet Decl. ¶¶ 17, 19, ECF No. 78-1.

GB Premium takes issue with Brunet's characterization that anyone can be a thread representative. Hanks Decl. ¶¶ 5, 11, ECF No. 86-6. Instead, GB Premium states that it specifically selects individuals with "specific oilfield background in monitoring connections or in torque-turn analysis" as thread representatives. ECF No. 86 at 10 (citing evidence, including Hanks Decl. ¶ 5, ECF No. 86-6 (declaring that thread representatives "typically have a background in torque turn"); Meche

Decl. ¶ 9, ECF No. 86-5 (declaring that to be a thread representative, individuals "should have a background in torque turn monitoring").

GB Premium also argues that differences among thread representatives in exercising initiative weighs against class certification. ECF No. 86 at 26 (citing Meche Decl. ¶¶ 5-7, ECF No. 86-5 (declaring that Meche contracted with GB Premium through his company GM Assets LLC to maximize profits)). According to GB Premium's President, certain thread representatives chose to pursue certain jobs that paid more than other jobs, such as daylight jobs, duo-line jobs, and jobs that require extensive driving while others did not. Tilley Decl. ¶¶ 17-20, ECF No. 86-3. A thread representative who controlled what sort of job they were willing to work controlled a "major component" of the business. *See Hickey*, 699 F.2d at 752 (noting that the plaintiff-salesman controlled "major components" of the business open to initiative, including the choice of other products to sell).

Some thread representatives also chose the days that they worked by choosing to accept certain jobs and not others, Tilley Decl. ¶¶ 4-6, ECF No. 86-3, which indicates significant initiative. *Eberline v. Media Net, L.L.C.*, 636 F. App'x 225, 229 (5th Cir. 2016) (noting that control over the days plaintiffs worked demonstrated initiative). In contrast, other thread representatives like Foret, did not exercise this sort of initiative because they accepted all GB Premium jobs offered to them. Foret Dep. 186:5-187:23, ECF No. 78-6.

24

Further, certain thread representatives brought clients to GB Premium, which also indicates initiative. *See* Hanks Decl. ¶ 18, ECF No. 86-6 (stating "[t]hrough my personal relationships with these company men, I have found my own work. These company men will call me about jobs. They do not call anyone at GB Premium. In fact, I inform GB Premium about an Aethon job."); *cf. Chapman v. A.S.U.I. Healthcare of Texas, Inc.*, No. CIV.A. H-11-3025, 2012 WL 3614187, at *6 (S.D. Tex. Aug. 21, 2012), *aff'd sub nom. Chapman v. A.S.U.I. Healthcare & Dev. Ctr.*, 562 F. App'x 182 (5th Cir. 2014) (finding that workers could not exercise initiative as "they cannot build new business because the clients come to ASUI through the MHMRA, which provides clients the opportunity to select a care agency from a preexisting list.").

Thus, this factor weighs against a collective action because the evidence shows differences in thread representatives' exercise of initiative that would lead to individualized inquiries.

### e. The permanency of the relationship factor requires individualized scrutiny.

The final factor in the economic realities test is the permanency of the relationship. When evaluating tis factor, the Fifth Circuit has set forth several considerations, including (1) whether a plaintiff "worked exclusively" for defendant, (2) the total length of relationship between the plaintiff and defendant, and (3) whether the work was on a "project-by-project basis." *Parrish*, 917 F.3d at 387.

This factor weighs against class certification for several reasons. First, there is evidence that some thread representatives worked exclusively for GB Premium while others did not. Foret Decl. ¶ 37, ECF No. 78-2 ("I worked exclusively for GB for more than two years."). Second, the total length of the relationship varied from thread representative to thread representative with some thread representatives contracting with GB Premium for short periods, Tilley Decl. ¶ 12, ECF No. 86-3 (describing thread representative that "only contracted with GB Premium for less [than] a month" and another that "caught jobs through GB Premium for a seven-month period"), while others worked for GB Premium for years, Foret Decl. ¶ 37, ECF No. 78-2. Therefore, both considerations require individualized scrutiny.

Although there is uniform proof regarding the third consideration of whether the work was on a project-by-project basis, that proof indicates that all thread representatives did in fact work on a project-by-project basis. Boemio Decl. ¶ 4, ECF No. 86-7; Tilley Decl. ¶ 13, ECF No. 86-3. Working on a project-by-project basis does not indicate that a worker was an employee. *Carrell*, 998 F.2d at 334 (concluding plaintiffs were independent contractors where their relationship with the defendant was "on a project-by-project basis").

Thus, this factor weighs against a collective action as the first two factors require individualized proof and the third factor shows they were independent contractors.

26

### C. Fairness and Procedural Considerations Weigh Against Class Certification.

The evidence presented shows that this case is not easily tried as a collective action. Whether a given thread representative is an employee or an independent contractor requires a factual inquiry into the economic realities test factors for each individual. Since this inquiry must be conducted for each potential plaintiff, there is no efficiency gained by trying all factual questions and defenses in a single trial. *See Kelly v. Healthcare Servs. Grp., Inc.*, No. 2:13-CV-00441-JRG, 2015 WL 3464131, at *5 (E.D. Tex. June 1, 2015) (finding that fairness and procedural questions factor weighed against certification where facts of the case required individualized inquiry). This factor weighs against certification.

## II.   CONCLUSION

The Court recommends that Brunet's Motion for Certification and Notice to Putative Class Members, ECF No. 78, should be denied. The case should proceed on behalf of Brunet individually

Signed on December 1, 2022, at Houston, Texas.

_Dena Palermo_
_____

**Dena Hanovice Palermo**
**United States Magistrate Judge**